**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | | |
|---|---|---|
| COURTNEY BESECKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00112-TWP-KMB |
| | ) | |
| FRANK LOOP, | ) | |
| B. REARDON, | ) | |
| ZACHARY SCHAEFER, | ) | |
| ROY WASHINGTON, | ) | |
| COURTNEY NICHOLS, | ) | |
| MARLENA BEACRAFT, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court the Defendants' Motions for Summary Judgment. the Defendants Frank Loop ("Sheriff Loop"), Brandon Reardon ("Officer Reardon"), and Zachary Schaefer ("Officer Schaefer") (collectively, the "State Defendants") seek summary judgment on the claims pending against them (Filing No. 81.) Defendants Roy Washington ("NP Washington"), Courtney Nichols ("Nurse Nichols"), and Marlena Beacroft ("Nurse Beacroft") (collectively, the "Jail Defendants") also seek judgment as a matter of law (Filing No. 88.) Plaintiff Courtney Besecker ("Ms. Besecker") initiated this action after she suffered a miscarriage while she was a pretrial detainee at the Floyd County Jail ("the Jail"). She asserts that the State Defendants and Medical Defendants violated the Fourteenth Amendment by failing to provide her with adequate medical care, and they were negligent in violation of Indiana State law. For the reasons explained below, summary judgment is **granted** on behalf of the Jail Defendants' and they are dismissed from this action; however, summary judgment is **denied** as to the Medical Defendants.

# I. <u>STANDARD OF REVIEW</u>

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 106 S.Ct. 1348 (1986), *see* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56©(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II. FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Ms. Besecker and draws all reasonable inferences in her favor. *Baines v. Walgreen Co.*, 863 F.3d 656, 659 (7th Cir. 2017). The Court does not vouch for the objective truth of these facts; the Court simply assumes them to be true for purposes of ruling on this motion. *See Stark v. Johnson & Johnson*, 10 F.4th 823, 825 (7th Cir. 2021).

### A. Ms. Besecker's Background

Ms. Besecker suffers from drug addiction. ([Filing No. 89-8 at 17](#).) When she was 21, her doctor misdiagnosed her with a back issue and prescribed her hydrocodone. *Id.* at 20. Ms. Besecker was eventually taken off hydrocodone, but by that time, she was addicted. *Id.* at 21. This led to her to daily using controlled substances, including Xanax, heroin, and Fentanyl. *Id.* In June 2022, Ms. Besecker learned that she was pregnant. *Id.* at 68. She began taking prenatal vitamins and scheduled an appointment at a methadone clinic in early July 2022. *Id.* at 42.

### B. Floyd County Jail

The Floyd County Jail is operated by the Floyd County (Indiana) Sheriff's Office, which is led by Sheriff Loop. ([Filing No. 106-2 at 10-11](#).) Sheriff Loop is an elected official who oversees the Sheriff's department and the Jail. *Id.* Sheriff Loop is responsible for providing training to correctional officers in Floyd County (the "County"), and officers must undergo a seven-week training course that covers every facet of working in corrections. *Id.* at 16. Once they have completed training, prospective officers have to pass a field test where they are graded by another officer. *Id.* Indiana requires only forty hours, but based on Sheriff Loop's experience, that amount of time is insufficient, so he created a seven-week program. *Id.* at 17, 19. One of the days is devoted to medical training, where the officers receive training on how to screen people and

address health issues. *Id.* at 21. Because the Jail contracts with a corporate medical provider, however, Sheriff Loop tries not to have his employees provide medical care. *Id.* Sheriff Loop provides the Jail policies to correctional officers when they go through the academy, and the officers are expected to review the Jail's policies. *Id.* at 25-26.

The Jail's policy when accepting custody of arrestees is not entirely clear. Ms. Besecker contends that the policy is encompassed in a Training Brief. (Filing No. 112-2.) The Training Brief provides a checklist for the booking officers to complete. *See id.* With respect to pregnant inmates who admits using drugs to the booking officer—the Training Brief states, "she must be sent to the hospital."[1] *Id.* at 2. The State Defendants contend the Training Brief is not the official policy, rather it was merely included in the full policy as part of the training program.

Correctional officers have more discretion when booking an inmate. When the Jail accepts custody of an arrestee, a correctional officer is responsible for conducting an initial assessment called an intake. (Filing No. 106-3 at 30.) The officer will conduct a physical examination of the arrestee and then ask them an initial set of questions based on their charges and history. *Id.* at 30-31. One of the initial questions asked to female detainee's is whether the arrestee is pregnant. *Id.* at 33. Another is whether the arrestee is using drugs. *Id.* at 34. Following the initial questions, the officer will then ask a set of medical questions to the arrestee. The purpose of the medical questions is to ensure the arrestee is healthy enough to be admitted into the jail. *Id.* at 32-33. Although the Training Brief states a pregnant arrestee who admits to using drugs must be sent to the hospital; the full policy provides that when a serious medical condition is suspected the corrections staff may have the jail nurse or provider conduct a more in-depth screening (*See* Filing No. 114 at 3, Filing 83-1 at 6, Filing 83-2. Filing 83-6, at 7.)

---

[1] Specifically, the Training Brief states "If they are a female ask them if there is any chance they could be pregnant. (If so ask how far along she is and if she has had any complications. If the female had admitted to doing drugs and is pregnant, she must be sent to the hospital.)" (Dkt. 112-2 at 2).

Once the initial assessment is completed, the arrestee is photographed, given hygiene products and essentials, and then taken to a holding cell to be placed into the Jail. (Filing No. 106-3 at 31-32.) The intake officer documents the arrestee's answers to the questions and then places the document in a folder, which is reviewed by medical staff each morning. *Id.* at 33-34. The intake officer is responsible for accepting an inmate into custody. *Id.* at 33.

If an inmate appears intoxicated or reports drug use, the Jail's medical staff can place the inmate on detox watch. (*See* Filing No. 106-1 at 38; *see* Filing No. 106-5 at 26 – 27.) Detox watch consists of being housed in an infirmary cell where there are cameras on the inmate at all times, and the inmate is usually checked on periodically. (Filing No. 106-5 at 26-28; *see* Filing No. 106-3 at 36). Both the nurse and the correctional officers observe inmates while they are on detox watch. (Filing No. 106-2 at 27.) Officers are not expected to make medical decisions and are instead expected to pass along any relevant information to medical staff. *Id.* at 30.

Sheriff Loop estimated that ninety-five percent or more of Floyd County's inmates have substance abuse or mental health issues. *Id.* at 24. Sheriff Loop stated that the County has limited resources, and there are limited substance abuse treatment options in Floyd County. *Id.*

## C. __Medical Care at the Jail__

The Jail contracts with Advanced Correctional Healthcare ("ACH") to provide medical care to its inmates. (Filing No. 83-2.) In July 2020, ACH employed Advanced practice Registered Nurse Practitioner Roy Washington as the Medical Director of the Jail. (Filing No. 106-4 at 8.) NP Washington earned his license and stated practicing in 2004. *Id.* at 8. In addition to Floyd County Jail, he was also the primary medical director for eighteen other facilities in Kentucky and Indiana. *Id.* at 8-9. NP Washington was on call for all nineteen facilities twenty-four hours a day,

seven days per week.  *Id.* at 11.  He worked in collaboration with the Director of ACH, who was a licensed physician.  ([Filing No. 107-11](#).)

Nurse Practitioner Washington was physically present at Floyd County Jail once a week. ([Filing No. 106-4 at 10](#).)  Typically, when he was present, he would sign patient charts and orders. *Id.* at 19.  He would also sometimes see patients, though the nurses at the Jail determined which patients he would see.  *Id.* at 20.  NP Washington did not consult with anyone outside of ACH on medical issues within the Jail; he did not supervise the work of the Jail nurses in any way; he did not train the nurses in any way; and he did not provide any training for the Jail staff.  *Id.* at 20-21. Other than his education, he does not have any specific training on substance withdrawal or medical issues for pregnant women, though he is familiar with the signs of withdrawal. *Id.* at 22. With respect to withdrawal treatment, NP Washington cannot prescribe Medication Assisted Treatment ("MAT"), which includes Methadone or Buprenorphine—drugs used to treat withdrawal.  However, he can prescribe Tylenol-3, which is listed as an alternative medication for withdrawal.  ([Filing No. 106-4 at 27](#).)  For more serious cases, NP Washington would send the inmate to the hospital.  *Id.* at 53. NP Washington agreed that benzodiazepine withdrawal can be fatal. *Id.* at 24.

ACH employed Licensed Practical Nurses (LPNs) to staff the Jail from 6:00 a.m. to 10:00 p.m.  ([Filing No. 106-1 at 12-13](#).)  There were three full-time nurses who were required to work two shifts from 6:00 a.m. to 12:00 p.m., and then each nurse would cover an additional eight-hour shift.  *Id.* at 13.  LPNs are not qualified to diagnose illnesses; rather they are qualified to treat illnesses but only with a doctor's order.  *Id.* at 11-12.  They can, however, send inmates to the hospital at any time for an emergency.  *Id.* at 36.  LPNs at the Jail would typically collect information, pass it on to NP Washington, and then execute his orders.  ([Filing No. 106-5 at 11](#).)

There were no nurses present from 10:00 p.m. to 6:00 a.m. because the inmates were usually asleep. (Filing No. 106-5 at 18). The overnight correctional officers, however, had basic medical training, and a medical provider was on call if the officers needed medical guidance. (Filing No. 106-2 at 32; Filing No. 106-4 at 11.) Courtney Nichols, one of ACH's LPNs, was responsible for training the overnight correctional officers. (Filing No. 106-1 at 19-21.) If they needed to decide when it was appropriate to call a doctor regarding an inmate's medical care, she instructed them "don't take that upon yourself" and to "put [the decision] on the provider." *Id.* at 22. Correctional officers, however, were authorized to transport inmates to the hospital in the event of the emergency. (Filing No. 106-2 at 32.)

Inmates can seek medical care by directly contacting medical staff through a kiosk or by speaking to an officer directly. (Filing No. 106-3 at 65.) Any time an inmate seeks medical attention, officers are trained to notify the on-duty nurse. (Filing No. 106-6 at 17.) Correctional officers are also trained to complete a "protocol sheet," which is a guide for non-medical professionals as to what information to obtain from the inmate. (Filing No. 106-5 at 75; Filing No. 83-21 at 5; *see also* Filing No. 83-22, Protocol Sheet).

D.      **The Underlying Events**

   1.      **July 5th and 6th**

At 3:31 a.m. on July 5, 2020, Ms. Besecker was arrested on an active warrant out of Floyd County, Indiana and booked into Clark County Jail in Jeffersonville, Indiana. (Filing No. 89-7.) Ms. Besecker had used heroin that night. (Filing No. 89-8 at 42.) While in the Clark County Jail, she was not provided any medical treatment for withdrawal. (Filing No. 106-1. at 28.)

Ms. Besecker was transferred to the Floyd County Jail on July 6, 2020 at 9:38 a.m. (Filing No. 89-1 at 7.) Officer Schaefer contacted the Floyd County Sheriff's Department to confirm that Ms. Besecker had an active warrant. (Filing No. 83-11.) Thereafter, Officers Reardon and Schaefer

booked Ms. Besecker into the Floyd County Jail. Officer Schaefer asked her if she had used drugs and if she was pregnant. (Filing No. 106-6 at 34.) Officer Reardon completed the booking medical questionnaire with Ms. Besecker. (Filing No. 83-12.) Ms. Besecker told them she used Heroin, Fentanyl, and Xanax; she stated she used heroin daily and Xanax three to four times a week. *Id.*; Filing No. 106-3 at 41. Ms. Besecker also told Officer Reardon she was pregnant. (Filing No. 83-12 at 2; Filing No. 106-3 at 42.) Officer Reardon printed out the questionnaire, Ms. Besecker acknowledged her answers, and Officer Reardon placed the documents in the medical folder to be reviewed by the medical staff. (Filing No. 106-3 at 42-43.) The medical questionnaire was completed at 10:31 a.m. on July 6, 2020. (Filing No. 83-12.)

Based on Ms. Besecker's answers, both officers contacted Nurse Nichols to assess Ms. Besecker. (Filing No. 89-8 at 45.) Nurse Nichols administered a pregnancy test, which came back positive. (Filing No. 106-1 at 27; *see also* Filing No. 83-13.) The pregnancy test was completed at 10:50 a.m. *Id.*

Ms. Besecker was booked into the Jail and placed in a detox-watch cell. (Filing No. 83-14 at 1.) She laid down because she was not feeling well. (Filing No. 89-8 at 45.) Ms. Besecker told Nurse Nichols that she had not used drugs in three days. (Filing No. 89-8 at 43.) However, she also told Nurse Nichols that she was "coming off" Xanax, heroin, and Fentanyl, that her withdrawal could possibly be more severe and long, and that she was worried about withdrawing because the obstetrician that she had an appointment with directed her not to "try to do this cold turkey." *Id.* at 45. At 11:00 a.m., Nurse Nichols documented the following:

> + pregnancy test. Reports [no] prenatal care. States this 6th pregnancy. Delivered 5 babies previously. Reports daily Fentynal [sic] use to this nurse. Reports she has not used in over 3 days. Bottom bunk ordered. Nighttime snack ordered. Detox watch started. Will notify provider. Pt. doesn't know how far along in pregnancy she is.

([Filing No. 83-14 at 1](#).)  This was the only interaction Nurse Nichols had with Ms. Besecker.

([Filing No. 89-1 at ¶ 6](#).)

NP Washington reviewed the note three hours later and approved placing Ms. Besecker on detox watch; he also started her on a prenatal vitamin.  ([Filing No. 89-6 at 2](#).)  Ms. Besecker was not sent to the hospital.  *Id.*

### 2.    July 7th – 11th

On July 7, 2020, Ms. Besecker was not eating because she did not feel well.  ([Filing No. 89-8 at 45-46](#).)  She reported that she was "hurting all over"; she complained of body aches and cold chills; and she stated she was too sick to eat.  ([Filing No. 83-14 at 1](#); [Filing No. 89-8 at 46](#).). By this time, Nurse Beacraft had taken over.  She educated Ms. Besecker on the importance of eating and pre-natal care; took her vitals, which were within normal limits; and contacted NP Washington, who prescribed Tylenol twice a day.  *Id.*

On July 8, 2020, Ms. Besecker again told correctional officers she was too sick to eat.  The officers relayed this information to the on-duty Nurse, who took Ms. Besecker's vitals and contacted NP Washington.  ([Filing No. 83-14 at 2](#).)  NP Washington placed Ms. Besecker on an anti-nausea medicine and ordered meal monitoring.  *Id.*  Meal Monitoring consists of officers observing and recording an inmate's food intake.  ([Filing No. 106-5 at 59](#).) When in an inmate is placed on meal monitoring, an email is sent out to correctional staff.  *Id.* at 61.  Accordingly, Nurse Beacraft sent the following email out:

> Inmate Besecker, Courtney is being moved to INF 1 and in addition to her medical watch she will also be on a meal monitor. The meal monitor sheet is going to be in Main control and the officer needs to mark the percentage of each meal that she eats on the log. This is a pregnant female who has decided that she is "too sick" to even attempt to eat her meal trays and has refused her trays. If you have any questions please feel free to contact medical.

([Filing No. 107-13](#).)

Over the next several days, Ms. Besecker remained in detox watch and meal monitoring. (Filing No. 83-18.) She never ate more than fifty percent of her food. *Id.* Ms. Besecker was stressed out being in detox watch because she was alone, she felt "so sick", and she was not able to take a shower. (Filing No. 89-8 at 47.) She tried making herself eat so that she could leave detox watch. *Id.*

On July 11, 2020, Nurse Beacraft consulted with NP Washington, and they both decided to remove Ms. Besecker from detox and meal monitoring. (Filing No. 106-5 at 64 – 69.) Although Ms. Besecker's blood pressure and pulse readings were slightly elevated and she was still not eating much, NP Washington and Nurse Beacraft noted that Ms. Besecker had no new medical complaints, and they believed it was appropriate to remove her from detox watch and meal monitoring. *See* Filing No. 83-17. Ms. Besecker was transferred to general population. (Filing No. 89-8 at 47.)

### 3. July 12th and 13th

Ms. Besecker woke up around 5:00 a.m. on July 12, 2020, to go to the bathroom and noticed "what [she] thought to be blood." *Id.* at 47-48; 83-84. She pushed the intercom button and notified corrections officers. *Id.* The officers took Ms. Besecker's vitals, gave her "some pads and stuff," and advised they when the nurse arrived at the Jail at 6:00 a.m., they would let the nurse know about Ms. Besecker's condition. *Id.* Officer Colton McPheeters ("Officer McPheeters") sent the following email to medical staff:

> On third shift at approximately 0500 Inmate Besecker, Courtney N#107994 stated she was pregnant (possibly 12 weeks) and bleeding. She stated it was extremely spotty and coagulated upon her waking up, when asked she stated she didn[']t have what she had bled on. Erring on the side of caution vitals were obtained. After vitals were taken it was expressed that she felt fine and I told her you all would see her in the morning.
>
> 140/101—P:95—O2%:100—Temp: 97.1

([Filing No. 83-20](#).) Officer McPheeters did not complete a protocol sheet nor did he immediately contact the provider, which is what the medical staff would have expected him to do. ([Filing No. 106-5 at 18](#) – 19, 75; [Filing No. 106-1 at 54](#)). Nurse Nichols, the nurse who trained the correctional officers, explained that Officer McPheeters should have called a medical professional because it was "out of his scope to decide if any medical treatment was needed or not." ([Filing No. 106-1 at 54](#).) Vaginal bleeding can be a common early pregnancy symptom but can also be a medical emergency. *Id.* at 54, 64. Because medical staff was arriving at 6:00 a.m., and they were typically diligent about checking their e-mail, Officer McPheeters did not contact the on-call provider. (Filing No. 83-21 at 6.)

When Ms. Besecker heard "the doors pop" for medical call, she went to the medical area and told the nurse about her bleeding. ([Filing No. 89-8 at 48](#).) The nurse told her to "put it on the kiosk." *Id.* Ms. Besecker did so at 7:01 a.m., reporting that she was bleeding and pregnant. ([Filing No. 83-23](#).) Nurse Beacraft responded at 7:33 a.m. that Ms. Besecker was "on the list to be seen by the nurse today." *Id.*

Ms. Besecker was not seen until 9:15 a.m., when Nurse Beacraft came and asked her some questions about when the bleeding started and how and where she was hurting. ([Filing No. 89-8 at 48-49](#); [Filing No. 106-5 at 72](#) – 73.) Nurse Beacraft asked to see Ms. Besecker's pad, but Ms. Besecker explained that she had recently changed it. ([Filing No. 89-8 at 49](#).) Nurse Beacraft and Ms. Besecker "kind of [got] into it" because Ms. Besecker wanted to be taken to the hospital, but Nurse Beacraft explained that decision was up to NP Washington. *Id.* Nurse Beacraft documented at approximately 9:50 a.m. that Ms. Besecker was "brought to medical to be seen for reports of bleeding and pelvic pain." ([Filing No. 83-14 at 2](#).) Ms. Besecker reported that her pain was worse in the right pelvic area; that it felt like "contractions"; that she had reported passing a "black clot" overnight; and that her pain was worse now, and that she was "wearing pad #3." *Id.* Nurse Beacraft

notified NP Washington, and he ordered at 9:55 a.m. that Ms. Besecker be taken to the emergency room. *Id.* at 3; ([Filing No. 106-5 at 76](#).)

Ms. Besecker was taken to the emergency room, where they ran tests, performed blood work, and conducted an ultrasound. ([Filing No. 89-8 at 49](#).) An emergency room physician informed Ms. Besecker that she had suffered a miscarriage. *Id.* at 50.

Ms. Besecker returned to the Jail around 2:00 p.m. and was bleeding "a lot." ([Filing No. 83-14](#) at 3.) Nurse Beacraft ordered corrections to issue extra pads and sent Ms. Besecker back to the block while she followed up with NP Washington. *Id*. Ms. Besecker was released from the Jail on July 13, 2020. ([Filing No. 89-4](#) ¶ 10.)

Ms. Besecker filed this lawsuit on July 12, 2021. ([Filing No. 1](#).) Nurse Beacraft and Nurse Nichols moved for judgment on the pleadings, ([Filing No. 24](#)), which was denied ([Filing No. 55](#)). Ms. Besecker also moved to voluntarily dismiss this action and pursue her claims in *Besecker v. Loop, et al.*, No. 4:22-cv-00084-TWP-KMB (S.D. Ind. 2022), which is a parallel action. (*See* Filing No. 61.) The Court subsequently denied that motion ([Filing No. 116](#)). Defendants now move for summary judgment. (Filing Nos. 81, 88.)

## E.   <u>Expert Testimony</u>

Ms. Besecker has retained Advanced Practice Nurse Practitioner Renee Dahring ("NP Dahring") as an expert on correctional health and nursing. ([Filing No. 107-5](#).) NP Dahring has been a registered nurse for thirty-four years and a nurse practitioner for twenty-two years. *Id.* ¶ II. She also has experience working with high-risk pregnant patients and providing care for individuals in a correctional setting. *Id.* In her findings, NP Dahring opines that the Medical Defendants failed to conduct any meaningful assessment of Ms. Besecker, and their withdrawal monitoring failed to meet the accepted standard of care. *Id.* ¶ VI.  Among her conclusions, NP

Dahring states that the Medical Defendants failed to meet the applicable standard of care in treating Ms. Besecker. *Id.* ¶ VII.

The Medical Defendants have retained two experts: Franklin Bean, M.D. ("Dr. Bean"), and Advanced Practice Nurse Practitioner Michael McMunn ("NP McMunn") (*See* Filing No. 89-2; Filing No. 89-3). Dr. Bean is a board-certified obstetrician/gynecologist who has practiced for over twenty-five years. (Filing No. 89-2.) He argues that Ms. Besecker's claims are "completely without merit" and opines that (1) fetal monitoring would not have been appropriate because Ms. Besecker was not far enough along; (2) Ms. Besecker's miscarriage was not related in any way to opiate withdrawal, and (3) Ms. Besecker never had a viable pregnancy to begin with. (Filing No. 89-2 at 3.) NP McMunn has twenty-five years of experience as a registered nurse and twenty years of experience as a nurse practitioner. (Filing No. 89-3 at 3.) He has worked in correctional health for over twenty-years and carries the highest available certification from the National Commission on Correctional Healthcare. *Id.* NP McMunn opines that the Medical Defendants met the appropriate standard of care in treating Ms. Besecker. *Id.* at 7-8.

## III. DISCUSSION

### A. Motion to Strike Expert Report

Before addressing the merits, the Court must first resolve a threshold issue: the timeliness of Ms. Besecker's expert disclosure. The Case Management Plan required Ms. Besecker to make her expert disclosures by July 13, 2022, which was later extended by Court Order to September 11, 2022. (Filing No. 27 ¶ F; Filing No. 52); *see* Fed. R. Civ. P. 6(a)(1)(c). The Case Management Plan also provides the following:

> G. Notwithstanding [the above expert disclosure deadline], if a party intends to use expert testimony in connection with a motion for summary judgment to be filed by that party, such expert disclosures must be served on opposing counsel no later than 90 days prior to the dispositive motion deadline. If such expert disclosures are served the parties shall confer within 7 days to stipulate to a date for responsive

disclosures (if any) and completion of expert discovery necessary for efficient resolution of the anticipated motion for summary judgment.

([Filing No. 27](#) ¶ G.)  Ms. Besecker disclosed her expert on September 12, 2022.  ([Filing No. 111-3](#).)

The Medical Defendants move to strike NP Dahring's report and opinions.  ([Filing No. 111 at 5-7](#).)  They contend once they disclosed their experts on May 10 and June 1, 2022, Ms. Besecker failed to confer with counsel within seven days to determine a disclosure date for her expert. Because Ms. Besecker failed to abide by the Case Management Plan, the Medical Defendants request that the Court strike NP Dahring's report and opinions. Although the expert disclosure was timely under the Court's previous Order, [Filing No. 52](#), Ms. Besecker concedes that she did not comply with Paragraph G of the Case Management Plan, and she contends striking the report and opinions would be unjust. ([Filing No. 113 at 1](#) ("Besecker must concede that she misunderstood Paragraph G's language and thus failed to comply with it.").)

"Rule 26(a)(2)(D) requires a party to disclose the identity of any expert witnesses and to provide their expert reports 'at the times and in the sequence that the court orders.'" *Trinity Homes, LLC v. Ohio Cas. Ins. Co. Group*, No. 1:04-cv-01920-SEB-DML, 2011 WL 2261297, at *2 (S.D. Ind. Jun. 8, 2011).  Failure to do so ordinarily results in the evidence being excluded unless the failure was substantially justified or harmless.  *See* Fed. R. Civ. P. 37(c)(1).

The Court declines to strike NP Dahring's report and opinions.  First, both parties—not just Ms. Besecker—share responsibility under the Case Management Plan as it relates to expert disclosures.  Paragraph G states that if any party discloses expert testimony to be used in connection with summary judgment, "**the parties** shall confer within 7 days to stipulate to a date for responsive disclosures." ([Filing No. 27](#), ¶ G (emphasis added).)  The Case Management Plan therefore puts the burden on both parties to agree upon a responsive date, not just the plaintiff.

The Medical Defendants therefore share at least some responsibility for failing to confer and to agree upon a responsive deadline.

Second, excluding NP Dahring's expert opinions and report would be incongruent to the harm suffered by the Medical Defendants. They do not object to NP Dahring testifying at trial, so any harm can likely be cured by allowing discovery before trial. (*See* Filing No. 111 at 7 ("While Plaintiff's expert Nurse Dahring can certainly testify at trial, her opinions must be stricken from consideration for purposes of [summary judgment].").) Additionally, the Medical Defendants never sought additional time to conduct discovery or depose NP Dahring once she was timely disclosed. This consideration also weighs against striking the proposed evidence. *See Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 418 – 419 (7th Cir. 2019) ("Rule 37 [] provides recourse for parties actually harmed by a litigant's noncompliance with disclosure obligations. It does not safeguard a party's decision to sense an error, seize on it, and then, when it is resolved, claim incurable harm in the face of apparent remedies. Litigation is adversarial, not a game of gotcha."). Accordingly, the Court **denies** the Medical Defendants' motion to strike NP Dahring's expert opinions and report. *Id.* (district court did not abuse discretion in admitting belated expert testimony where opposing party did not request additional time and instead proceeded with a motion to strike); *Trinity Homes*, 2011 WL 2261297 at *6 (declining to strike expert reports that were disclosed late because sanction would be drastic).[2]

## B.    <u>Federal Claims</u>

Turning now to the merits of Ms. Besecker's federal claims, she alleges all Defendants acted objectively unreasonable in providing her medical care in violation of the Fourteenth

---

[2] The Medical Defendants also move to strike several exhibits that Ms. Besecker relies on in her summary judgment response. (Filing No. 111 at 2-5.) The Court does not rely on these exhibits, and these exhibits are immaterial to the Court's resolution of the summary judgment motions, so this request is **denied as moot**.

Amendment. She also alleges Floyd County[3] is liable under *Monell* for failing to adequately supervise and train its officials. Defendants move for summary judgment on the respective claims against them.

1. **Objective Unreasonableness – All Individual Defendants**

The Fourteenth Amendment prohibits state officials from acting objectively unreasonable when providing pretrial detainees with medical care. *See Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). A defendant may be liable when (1) they acted purposefully, knowingly, or recklessly when they considered the consequences of their handling the plaintiff's case, and (2) they acted objectively unreasonable. *McCann v. Ogle Cty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018). This inquiry is very fact-intensive, taking into account all of the facts and circumstances at the time of the alleged conduct. *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019). With this in mind, the Court analyzes Ms. Besecker's claims against each Defendant.

a. **Frank Loop**

Sheriff Loop was the County Sheriff at the time of the incident. There is no evidence that he was personally involved in Ms. Besecker's treatment. *Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019) ("In an action under § 1983, the plaintiff must establish individual liability …. Thus, [the plaintiff] must be able to establish [the defendant's] personal involvement in the alleged constitutional deprivation.") (cleaned up); *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (individual defendants cannot be held liable under § 1983 unless they had some personal involvement in the alleged deprivation). Additionally, Ms. Besecker did not respond to Sheriff Loop's motion for summary judgment on her claims against him in his individual capacity. (*See*

---

[3] This claim is actually brought against Sheriff Loop in his official capacity. For ease of reading, the Court labels this claim as being one against the County to distinguish it from Ms. Besecker's claims against Sheriff Loop in his individual capacity.

Filing No. 114 at 11-12.)   Accordingly, summary judgment is appropriate on Ms. Besecker's objective reasonableness claim against Sheriff Loop.

### b.    **Zachary Schaefer and Brandon Reardon**

Officer Shaefer and Officer Reardon were involved with booking Ms. Besecker into the Jail.  Officer Schaefer confirmed that Ms. Besecker had an active warrant and asked if she had used drugs and if she was pregnant.  Officer Reardon completed the booking questionnaire, in which Ms. Besecker stated she had used heroin daily and Xanax three to four times per week. Based on these answers, they contacted Nurse Nichols, who gave Ms. Besecker a pregnancy test and placed her in detox watch.  The officers' entire involvement spanned from 9:38 a.m. to 10:31 a.m.  Based on this involvement, no rational jury could find they acted objectively unreasonable.

Ms. Besecker opposes this conclusion.  She counters that these officers violated the County's official policy,[4] which required them to send her immediately to the hospital because she was pregnant and admitted to using drugs.  But violations of county policy do not automatically violate the Constitution.  *See Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir.2009). Officer Shaefer and Officer Reardon were trained to get medical personnel when an inmate needs medical care, (Filing No. 106-6 at 18-20), and they immediately contacted medical personnel after booking Ms. Besecker into the Jail.  Additionally, the law permits correctional officers, like Officer Shaefer and Officer Reardon, to defer to medical personnel for these types of decisions. *See McGee v. Parsano*, 55 F.4th 563, 566 (7th Cir. 2022) ("Established circuit precedent entitles a corrections officer to defer to the judgment of medical professionals.").  No reasonable jury would find that the officers' decision to defer to Nurse Nichols was objectively unreasonable.

---

[4] Again, it is disputed whether the Training Brief is actually the County's policy; however, the Court resolves this dispute in Ms. Besecker's favor (as the non-movant) for purposes of ruling on the present motions for summary judgment. *Khungar*, 985 F.3d at 572-73.

Ms. Besecker also faults Officer Shaefer for placing her on normal detox watch when the Jail policy required particular protocols for monitoring opiate-dependent women. But Officer Shaefer only did so at Nurse Nichols' instruction, and, again, it was not objectively unreasonable for him to defer to her orders. *McGee*, 55 F.4th at 566.

For these reasons, no rational jury could find in Ms. Besecker's favor against Officer Shaefer and Officer Reardon on her claims of objective unreasonableness.

### c.     <u>Frank Loop, Zachary Schaefer, and Brandon Reardon</u>

The Jail Defendants also raise qualified immunity as an additional defense to liability. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78 – 79 (2017) (citation omitted) (internal quotation marks omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 – 12 (2015).

Even if a jury could find any of the Jail Defendants violated Ms. Besecker's constitutional rights, the Jail Defendants would nonetheless be entitled to qualified immunity. Officer Shaefer and Officer Reardon booked Ms. Besecker into the Jail and then immediately obtained a nurse to evaluate her. Sheriff Loop was not personally involved in any of Ms. Besecker's treatment. Existing precedent does not place the question of whether each Jail Defendant acted unreasonably under these circumstances "beyond debate." *Mullenix*, 577 U.S. at 14. Quite the contrary, existing precedent establishes that correctional officers can usually defer to medical personnel. *McGee*, 55 F.4th at 566.

Ms. Besecker contends the Seventh Circuit has long made clear that a jail official who has reason to believe or actual knowledge that the medical staff is mistreating (or not treating) a detainee must act to obtain appropriate treatment. ([Filing No. 112 at 15](#).) While that may be true

in the abstract, Ms. Besecker has not identified a case that demonstrates every reasonable officer would have acted otherwise when faced with the same circumstances *in this case*, and the United States Supreme Court has repeatedly stressed not to define the qualified immunity analysis at such a high level of generality. *Mullenix*, 577 U.S. at 12. The Jail Defendants are therefore entitled to qualified immunity.[5]

### d.   <u>Courtney Nichols</u>

Nurse Nichols was the first medical official to care for Ms. Besecker after she was booked into the Jail. Nurse Nichols administered a pregnancy test that came back positive. She placed Ms. Besecker on detox watch and did not transfer her to the hospital. While Ms. Besecker reported to Nurse Nichols she had "not used" in three days, she also reported that she was "coming off" Xanax, heroin, and fentanyl, and that her withdrawal could be more severe and long. Ms. Besecker also relayed that she was worried about withdrawal and that her obstetrician had told her not "to do this cold turkey." Nurse Nichols did not conduct an examination nor did she drug test Ms. Besecker, and she admitted having knowledge that miscarrying is one of the risks pregnant woman face when withdrawing. ([Filing No. 106-1 at –48-49](#).) Based on this evidence, a jury could find that Ms. Besecker was at risk of opiate withdrawal and that miscarriage was a risk of opiate withdrawal. A jury could also find that Nurse Nichols acted (1) deliberately and purposefully, and (2) objectively unreasonable in not seeking additional medical care or transferring Ms. Besecker to the hospital. Summary judgment is therefore not appropriate.

Nurse Nichols downplays her involvement, explaining that she only saw Ms. Besecker one time and it was NP Washington's decision to place Ms. Besecker on detox watch. But Nurse

---

[5] Ms. Besecker also argues the Court should not recognize doctrine of qualified immunity because it is a judicial doctrine that was not recognized at common law. ([Filing No. 112 at 16](#).) Qualified immunity, however, is a doctrine established and recognized by the United States Supreme Court and in this Circuit. *See Estate of Davis v. Ortiz*, 987 F.3d 635, 638 (7th Cir. 2021). Unless and until the higher courts change course, this Court must follow suit. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

Nichols' involvement was significant: she was the first medical officer to evaluate Ms. Besecker, and she testified she placed Ms. Besecker on detox watch *before* contacting NP Washington because she believed it was appropriate. *Id.* at 38. Her involvement was also critical because her information is what NP Washington relied on when making medical decisions. Additionally, nurses have an independent duty ensure inmates receive adequate medical care. *See Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015); *see also McCann*, 909 F.3d at 887 (explaining deference to a treating physician's orders may not be blind or unthinking). A jury must therefore resolve questions about her liability.

### e. <u>Marlena Beacraft</u>

Nurse Beacraft treated Ms. Besecker on several occasions. On July 7, 2020, Nurse Beacraft observed Ms. Besecker in detox watch not eating meals and complaining that she was "hurting all over." ([Filing No. 83-14](#).) She took Ms. Besecker's vitals, contacted NP Washington, and followed his orders to provide Tylenol. The next day, on July 8, 2020, NP Washington placed Ms. Besecker on meal watch. Nurse Beacraft informed the correctional officers that Ms. Besecker was "a pregnant female who has decided that she is 'too sick' to even attempt [to eat]." ([Filing No. 107-13](#).) On July 11, 2020, Nurse Beacraft decided in conjunction with NP Washington to remove Ms. Besecker from meal watch. ([Filing No. 106-5 at 64-69](#).) Given these interactions, a jury could reasonably conclude that Nurse Beacraft acted deliberately and purposefully and acted objectively unreasonable by downplaying Ms. Besecker's symptoms and ignoring the risk of opiate withdrawal.

Additionally, Nurse Beacraft also was responsible for treating Ms. Besecker on July 12, 2020, the day when Ms. Besecker had suffered vaginal bleeding overnight. Despite being notified at 7:01 a.m. about the bleeding, Nurse Beacraft told Ms. Besecker to use the medical request kiosk and did not treat her until 9:15 a.m. She did not relay information to NP Washington until 9:55

a.m. after she had "gotten into it" with Ms. Besecker. ([Filing No. 89-8 at 49](#).) A jury could likewise conclude her actions in delaying Ms. Besecker's treatment were deliberate and purposeful and objectively unreasonable. *See Lewis v. McLean*, 864 F.3d 556, 563 – 64 (7th Cir. 2017) (hour and a half delay of treatment of muscle spasms and back pain was excessive under the Eighth Amendment).

Similar to Nurse Nichols, Nurse Beacraft argues her involvement was limited and she was generally constrained by NP Washington's orders. However, a jury could find that Nurse Beacraft participated in the decision to remove Ms. Besecker from meal monitoring and detox watch. A jury would also be well within its rights to find that Nurse Beacraft downplayed Ms. Besecker's symptoms and delayed treatment on July 12, 2020. Nurse Beacraft is therefore not entitled to summary judgment.

### f.     Roy Washington

NP Washington was the medical official who was ultimately responsible for Ms. Besecker's treatment. Although he worked in conjunction with the nurses, he was responsible for modifying Ms. Besecker's orders. NP Washington was aware that Ms. Besecker was pregnant, that she was a drug user, that she was at risk of opiate withdrawal, and miscarriage is a risk of opiate withdrawal. Despite knowing these circumstances, NP Washington prescribed symptomatic treatment and opted to keep her at the Jail rather than transfer her to a hospital. A jury could find NP Washington's decisions were deliberate and objectively unreasonable. *Miranda v. County of Lake*, 900 F.3d 335, 354 (7th Cir. 2018) (holding a jury could find doctors acted objectively unreasonable when they chose a "wait and see" monitoring plan rather than transporting an inmate to the hospital when the inmate was neither eating nor drinking nor competent to care for herself).

NP Washington contends that Ms. Besecker was not a high risk of opiate withdrawal because she had not used drugs in over seventy-two hours. However, this is factual dispute. Ms. Besecker testified that she relayed that she was "coming off" Xanax, heroin, and fentanyl and that her withdrawal could be long and more severe.

NP Washington also contends her vitals were stable and she did not have any "severe" complaints, so no additional treatment was necessary. But this too is disputed. Ms. Besecker constantly complained that she hurt all over, and she was hardly eating her meals. This is not to say that a jury would not believe NP Washington. But there are factual disputes that must be resolved by a jury. Summary judgment is therefore inappropriate. *Miranda*, 900 F.3d at 354.

In short, summary judgment is appropriate on Ms. Besecker's objective unreasonableness claims against the Jail Defendants; summary judgment is not appropriate on Ms. Besecker's claims against the Medical Defendants.

### 2. *Monell* Liability – Floyd County

"A *Monell* claim subjects a local governing body like [Floyd County] to liability when an official policy, widespread custom, or action by an official with policy-making authority was the moving force behind a constitutional injury." *McCann*, 909 F.3d at 888 (internal quotations and citations omitted); *see also Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978). To present her *Monell* claim to a jury, Ms. Besecker must the put forward sufficient evidence that (1) a policy, custom, or widespread practice that caused her injury (not just individual actors); (2) the County was deliberately indifferent to a known or obvious risk that its policy would likely lead to constitutional violations; and (3) that the County's action was the "moving force" behind the constitutional violation. *See First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 – 987 (7th Cir. 2021); *see J.K.J. v. Polk County*, 960 F.3d 367, 377, 379 – 80 (7th Cir. 2020).

Ms. Besecker puts forth three potential grounds for *Monell* liability: (1) the County failed to train on or enforce its policy requiring officers to send pregnant drug users to the hospital; (2) the County failed to train on or enforce its policy requiring particular protocols for opiate-dependent pregnant women; and (3) the County permitted NP Washington to be its medical provider even though he could not prescribe adequate withdrawal treatment. ([Filing No. 112 at 18-20](#).)

The designated evidence does not allow Ms. Besecker to survive summary judgment on any of the theories.

### a. The County failed to train on or enforce its policy requiring officers to send pregnant drug users to the hospital

Ms. Besecker contends that the Training Brief creates a County policy requiring officers to send pregnant drug users to the hospital, but the County failed to train officers on that policy. The County disputes that the Training Brief was an official policy. Regardless, this theory of *Monell* liability fails.

If the Training Brief does constitute official County policy, there is no evidence that the County was deliberately indifferent to a known or obvious risk that the policy would likely lead to constitutional violations. There is no evidence of any other similar constitutional violations. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 240 (7th Cir. 2021) ("[W]e have repeatedly rejected *Monell* claims that rest on the plaintiff's individualized experience without evidence of other constitutional violations."); *see also Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 – 31 (7th Cir. 2022) (affirming summary judgment on Monell claim where plaintiff provided no evidence of any pattern of similar violations). Indeed, the record reflects there was only one

other miscarriage at the Jail that occurred prior to the County contracting with ACH, and it involved an inmate "self-aborting." (Filing No. 106-2 at 69.)

If, on the other hand, the Training Brief does not constitute official County policy, there is no evidence the County was deliberately indifferent to a known or obvious risk that correctional officers seeking medical guidance would lead to constitutional violations. It is not enough for Ms. Besecker to show that the County adopted a policy, the policy was not followed, and a constitutional injury occurred. She must show that the County was aware its policies could lead to such a result and chose not to do anything. The record does not allow such a conclusion.

Ms. Besecker's theory also fails for an additional reason: causation. The evidence shows that the Medical Defendants exercised their medical judgments when treating Ms. Besecker. That judgment may or may not have been correct, but no additional training or enforcement of its policies related to the officers could have overridden the medical judgment of Nurse Nichols, Nurse Beacraft, and NP Washington. *McCann*, 909 F.3d at 888 (no *Monell* liability, in part, because the record reflected the key decisions were a product of the doctor's medical judgement and the correctional officers had no reason to question the adequacy of the medical care).

Ms. Besecker relies on *J.K.J. v. Polk County*, for her argument that the County had an obligation to protect incarcerated pregnant women, like herself. 960 F.3d at 382; *see also* Filing No. 112 at 22. The *J.K.J.* court relied heavily on expert testimony to establish what policies were necessary to prevent sexual assault and how they could have been implemented at little to no cost. In this case, there is no expert testimony. Moreover, in *J.K.J.*, there was evidence that sexual misconduct was rife in the jail prior to the ultimate incidents in question. *See J.K.J.*, 960 F.3d at 372-74 ("[The Guard's] conduct was not the only evidence of sexual misconduct at the Polk County

Jail that the Jury heard."); ("Sexual harassment had appeared in the jail in other ways too.").  Here, there is no evidence that would have put the County on notice that its policies were deficient.

Ms. Besecker also argues this is one of the "rare" cases where the risk of unconstitutional treatment was patently obvious despite no evidence of other constitutional violations resulting from the County's policy.  *See Dean*, 18 F.4th at 240.  She cites to the fact that Sheriff Loop stated that ninety-five percent or more of Floyd County's inmates have substance abuse or mental health issues, and the County had specific policies addressing drug use and pregnancy, which shows it was aware more training on the policies were needed. But the County was not deliberately indifferent to these risks.  It contracted with ACH to make medical decisions at the Jail.  It put its officers through a seven-week training academy.  The medical providers had discretion (in their medical judgment) to treat patients onsite or refer them to the hospital if they could not be treated at the Jail.  There is nothing to suggest this approach was so fatally deficient that it would lead to constitutional violations.

> **b.    The County failed to train on or enforce its policy requiring particular protocols for opiate-dependent pregnant women**

Next, Ms. Besecker contends that Officer Reardon, Officer Schaefer, and the medical staff were not trained on the County's detoxification policy, (*see* [Filing No. 107-12](#)).  However, Officer Reardon and Officer Schaefer were not involved in Ms. Besecker's medical care beyond booking her into the Jail.  As to the medical providers, the County contracted with ACH to provide medical care at the Jail, and Nurse Nichols, Nurse Beacraft, and NP Washington made medical decisions based on their judgment.  There is no evidence that the County had reason to question those judgments or know ahead of time that the medical decisions being made were unreasonable.  This *Monell* theory likewise fails.

### c. **The County permitted NP Washington to be its medical provider even though he could not proscribe adequate withdrawal treatment.**

Finally, Ms. Besecker contends the County should be held liable for contracting with NP Washington to provide medical care at the Jail because "the County deliberately chose to permit Washington to be its responsible medical provider though he could not prescribe standard of care treatment and deliberately chose to not adopt other strategies for ensuring the County provided standard of care treatment." (Dkt. 112 at 20). In particular, Ms. Besecker argues that contracting with NP Washington violates Indiana's regulations, 210 Ind. Admin. Code § 3-1-11(a), and was likely to lead to constitutional violations because he cannot legally prescribe methadone or buprenorphine, which is the standard of care treatment for opioid-dependent withdrawal. *Id.*

Violations of state law do not necessarily mean the Constitution has been violated. *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws[.]"). And in any event, it is not clear the County was violating state law. The record shows that NP Washington worked in collaboration with ACH's medical director, who was a licensed physician. *See* 848 Ind. Admin. Code § 5-1-1(7) (authorizing an advanced practice nurse to prescribe controlled substances if they collaborate with a licensed practitioner); Filing No. 107-11. Ms. Besecker has cited no authority that such an arrangement violates Indiana law.

Second, NP Washington had the ability to treat withdrawal. He could prescribe Tylenol 3 as an opiate replacement. (Filing No. 89-6.) Although he could not provide MAT treatment, he was permitted to (and did) refer patients to hospitals for treatment that he could not provide or the Jail could not provide. (Filing No. 106-4 at 53 ("Q: Have you sent inmates from the Floyd County jail to the hospital due to withdrawal? A: Yes).) And for reasons already explained, there is no

evidence the County was on notice that NP Washington's treatment was deficient prior to the events taking place in this case. Accordingly, this *Monell* theory likewise cannot proceed.

One final point is worth addressing. Ms. Besecker argues Officer McPheeters violated County policy by not contacting medical immediately when she notified him of her vaginal bleeding. When asked what he thinks Officer McPheeters should have done, Sheriff Loop stated "[j]ust what he did." ([Filing No. 106-2 at 45](#).) Ms. Besecker contends Sheriff Loops' condoning of this behavior amounts to deliberate indifference on the part of the County. But whether Officer McPheeters violated Ms. Besecker's rights is not before the Court in this lawsuit.[6] And in any event, Sheriff Loop's after-the-fact assessment does not show the County was deliberately indifferent before the incidents at issue here.

For those reasons, the County's motion for summary judgment on Ms. Besecker's *Monell* claims is **granted**.

## C.     State Claims

Turning now to the merits of Ms. Besecker's state law claims, she alleges all Defendants were negligent in their medical treatment in violation of Indiana state law. Defendants move for summary judgment on these claims. To succeed on her claims of negligence,[7] Ms. Besecker must show that each defendant (1) owed a duty to her; (2) breached that duty; and (3) the breach proximately caused the plaintiff's injuries. *Siner v. Kindred Hosp. Ltd. Partnership*, 51 N.E.3d 1184, 1187 (Ind. 2016). The Court first turns to the Jail Defendants.

---

[6] Officer McPheeters is named as a defendant in the parallel lawsuit, but not in the instant action. *See Besecker v. Loop, et al.,* Case No. 4:22-cv-00084-TWP-KMB (S.D. Ind. 2022).

[7] The parties label these claims somewhat differently. Plaintiff asserts the Defendants were negligent or committed medical negligence. The Medical Defendants identify this claim as one of medical malpractice. These are for all intents and purposes the same claim. *Nasser v. St. Vincent Hosp. and Health Servs.*, 926 N.E.2d 43, 47 – 48 (Ind. Ct. App. 2010) ("Medical malpractice cases are no different from other kinds of negligence actions regarding what must be proven.").

## 1.    The Jail Defendants

Summary judgment is appropriate on this claim because Ms. Besecker failed to comply with the notice provisions of the Indiana Tort Claims Act, which required her to provide notice of her tort claims within 180 days of the action giving rise to her claims.  *See* Ind. Code § 34-13-3-8(a); *Miller v. St. Joseph Cnty.*, 788 F.3d 714, 717 (7th Cir. 2015); *see also* Filing No. 83-26 at 2, (Q: Did you file a Notice of Tort Claim with any Defendant(s) prior to filing this lawsuit? A: No.). Ms. Besecker has not argued otherwise in her response.  Accordingly, the Jail Defendants' motion for summary judgment on Ms. Besecker's state law claims is **granted**.

## 2.    The Medical Defendants

Summary judgment is not appropriate to any of the Medical Defendants on Ms. Besecker's negligence claims.  Without recounting all of the previously discussed evidence, a jury could rationally find that these Defendants negligently treated Ms. Besecker by failing to provide her with more aggressive withdrawal treatment, ignoring her complaints of pain and discomfort, downplaying her symptoms, and opting for a "wait and see" approach without adequately assessing the risks to Ms. Besecker or her child.  Additionally, while expert testimony is ordinarily required under Indiana law, *Sorrells v. Reid-Renner*, 49 N.E.3d 647, 651 (Ind. Ct. App. 2016), Ms. Besecker has proffered NP Dahring who has opined the following:

> Neither LPN Beacraft, LPN Nichols nor NP Washington performed any meaningful assessment as to the status of her pregnancy or the history and pattern of her drug usage nor did they do a urine drug screen to accurately determine which substances Ms. Besecker was using. …

> The withdrawal monitoring used to assess Ms. Besecker does not meet the accepted standard of care for the community or the correctional environment. …

> Withdrawal monitoring and meal monitoring was abruptly ended without any clinical assessment. There is no explanation as to what constitutes an adequate meal intake or what parameters were used to justify ending withdrawal monitoring. ….

> [Nurse Beacraft] … was accepting an assignment for tasks she was not qualified to perform which puts her outside her scope of practice and constitutes an unsafe situation. As a result, she failed to comprehend her assessments were woefully inadequate for a pregnant woman undergoing opiate and benzodiazepine withdrawal and thus put the health and safety of Ms. Besecker and her unborn baby at significant risk.
>
> NP Washington did not meet standard of care when taking calls from LPN Beacraft….he testified in deposition that he made his clinical decisions for Ms. Besecker based only on the information the LPN chose to provide to him.... Clinical decision making and prescribing based on minimal information is below the standard of practice and is a significant risk to patient safety.
>
> The medical staff ignored the health risks to Ms. Besecker and her unborn baby by failing to perform a competent assessment. LPNs Nichols and Beacraft and NP Washington were aware that Ms. Besecker was pregnant and experiencing the objective clinical signs of active opiate withdrawal, but neither the LPNs or the NP made any effort to perform an adequate pregnancy history to determine how far along Ms. Besecker was in her pregnancy or to fully evaluate her drug usage. This falls far below the standard of care that is expected of a health care professional.

(Filing No. 107-5 at 4-5.)  Ms. Besecker argues that NP Dahring's opinions and conclusions, as well as the rest of the record in this case, support her claims for medical negligence.

The Medical Defendants insist otherwise.  They contend that they have met the standard of care, citing their experts which directly contradict NP Dahring's report and conclusions.  (*See* Filing No. 89-2; Filing No. 89-3.)  However, these experts only show that there are material facts in dispute, including whether the Medical Defendants breached any duty owed to Ms. Besecker and whether that breached caused her damages.  *See Siner*, 51 N.E.3d at 1187 ("[E]xpert opinions which conflict on the ultimate issues necessarily defeat summary judgment."); *see also Sorrells*, 49 N.E.3d at 651 ("[M]edical malpractice cases are rarely appropriate for disposal by summary judgment.").

The Medical Defendants assert, even considering NP Dahring's report, summary judgment is appropriate because there is no medical evidence contradicting Dr. Bean's conclusions that (1) Ms. Besecker's miscarriage was not in any way related to substance abuse or substance withdrawal,

and (2) Ms. Besecker had a non-viable pregnancy. (*See* Filing No. 89-1.) Essentially, they argue Ms. Besecker has failed to meet her burden as to causation, a necessary element of her negligence claim. (Filing No. 111 at 11); *see also Siner*, 51 N.E.3d at 1187.

However, under Indiana law, "[t]he defendant[s'] act need not be the sole cause of the plaintiff's injuries; it needs to be only one of the proximate causes rather than a remote cause." *Carey*, 926 N.E.2d at 1129. And given that standard, Ms. Besecker has adduced sufficient evidence for this question to be resolved by a jury given the facts that: (1) Ms. Besecker informed the Medical Defendants that she was pregnant; (2) Ms. Besecker was suffering from withdrawal; (3) Nurse Nichols administered a pregnancy test that came back positive; (4) NP Dahring opined that the Medical Defendants beached the standard of care when treating Ms. Besecker while she was at Floyd County Jail; and (5) Ms. Besecker ultimately miscarried. This is enough to present the issue of causation to a jury. *See Chi Un Ho v. Frye*, 880 N.E.2d 1192, 1200-01 (Ind. 2008) (finding question of fact in medical malpractice case even though doctor's affidavit was "sparse" and did not contain "any facts supporting his conclusions), cited with approval in *Siner*, 51 N.E.3d at 1190. The Medical Defendants' motion for summary judgment on Ms. Besecker's state law claims is therefore **denied**.

## IV.   CONCLUSION

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate only if there is no genuine issue as to any material fact. As explained above, there are numerous material facts in dispute concerning the Medical Defendants. The Court does not determine whether the disputed facts are true, but simply determines whether the disputed facts could lead a reasonable jury to find in favor of the non-moving party—Courtney Besecker. For the reasons stated above, the Motion for Summary Judgment filed by Roy Washington, Courtney Nichols, and Marlena

Beacraft, ([Filing No. 88](#)), is **DENIED**. The claims against the Medical Defendants shall proceed to trial or settlement.

The Motion for Summary Judgment filed by Frank Loop, Brandon Reardon, and Zachary Schaefer, ([Filing No. 81](#)), is **GRANTED** and the claims against the State Defendants are **dismissed**. The **Clerk is directed to terminate** Frank Loop, B. Reardon, and Zachary Schaefer as defendants from the docket.

No partial final judgment shall enter at this time.

**SO ORDERED.**

Date: 3/20/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Gregory A. Belzley
BELZLEY, BATHURST & BENTLEY
gbelzley3b@gmail.com

Aaron J. Bentley
abentley3b@gmail.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP (New Albany)
jlowe@k-glaw.com

Whitney Elizabeth Wood
KIGHTLINGER & GRAY, LLP (New Albany)
wwood@k-glaw.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Travis W. Montgomery
BLEEKE DILLON CRANDALL, P.C.
travis@bleekedilloncrandall.com